IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ERIN WINANS, | ) | CASE NO. 3:25-CV-02654-JJH |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JEFFREY J. HELMICK |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Erin Winans ("Plaintiff" or "Winans"), challenges the final decision of Defendant, Frank Bisignano, Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In April 2023, Winans filed an application for POD, DIB, and SSI, alleging a disability onset date of April 1, 2023, and claiming she was disabled due to post-traumatic stress disorder, anxiety disorder, severe depressive disorder, fibromyalgia, diabetes mellitus, peripheral neuropathy, spinal stenosis, chronic

pain, and osteoarthritis. (Transcript ("Tr.") 14, 76.) The applications were denied initially and upon reconsideration, and Winans requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 14.)

On December 2, 2024, an ALJ held a hearing, during which Winans, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On February 21, 2025, the ALJ issued a written decision finding Winans was not disabled. (*Id.* at 14-28.) The ALJ's decision became final on October 6, 2025, when the Appeals Council declined further review. (*Id.* at 1-6.)

On December 6, 2025, Winans filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 8-10.) Winans asserts the following assignments of error:

(1) The ALJ committed reversible error by finding that the Plaintiff's claims about neuropathy were not supported by the evidence in the record, when the evidence regularly documents complaints of neuropathy in her hands and feet.

(2) The ALJ committed reversible error by relying on a single A1c reading, when the record contains reliable evidence of unstable blood glucose levels and resulting symptoms throughout the relevant period under consideration.

(Doc. No. 8 at 8-9.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Winans was born in January 1980 and was 44 years old at the time of her administrative hearing (Tr. 26), making her a "younger" person under Social Security regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). She has at least a high school education. (Tr. 26.) She has past relevant work as a quality control clerk, mixer operator, and delivery driver. (*Id.* at 25-26.)

**B. Relevant Medical Evidence**[1]

On April 21, 2022, Winans saw Adil Omar Katabay, M.D., for follow up and reported it seemed like her pain medication was not helping anymore. (*Id.* at 409.) Winans endorsed pain in her neck, left shoulder, and bilateral hands, knees, and feet that she rated as a 4/10. (*Id.* at 409, 413.) Winans also complained of numbness and tingling in her hands. (*Id.* at 413.) Winans felt Naproxen worked better than Mobic. (*Id.* at 414.) Dr. Katabay noted Winans used THC on occasion. (*Id.* at 409.) While Winans felt her pain medication helped her chronic pain, it did not help her shoulder pain. (*Id.* at 410.) Winans admitted taking extra medication when her pain was unbearable and running out of medication before her refill date. (*Id.*) On examination, Dr. Katabay found altered gait, bilateral facet tenderness, bilateral facet loading, and decreased lumbar flexion and extension. (*Id.* at 412.) Dr. Katabay increased Xtampza, switched Naproxen for Mobic, and continued Zanaflex, Trazadone, and Gabapentin. (*Id.* at 414.)

On July 21, 2022, Winans saw Dr. Katabay for follow up and reported the nerve pain in her feet had been "really bad." (*Id.* at 418.) Winans endorsed pain in her neck, left shoulder, and bilateral hands, knees, and feet that she rated as a 3/10. (*Id.* at 418, 423.) Winans also complained of numbness and tingling in her hands. (*Id.* at 423.) On examination, Dr. Katabay found altered gait, bilateral facet tenderness, bilateral facet loading, decreased lumbar flexion and extension, and trigger point tenderness with palpation of the paravertebral area of the lumbar spine. (*Id.* at 422.) Dr. Katabay increased Gabapentin, started Winans on a compound cream, and continued Zanaflex and Trazadone. (*Id.* at 424.)

Winans continued to endorse bilateral hand pain, numbness, and tingling throughout 2022 and into 2023. (*Id.* at 429, 433, 439, 442, 483, 487, 501, 505, 519, 523, 543, 547.) Dr. Katabay found similar

---

[1] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. Because Winans challenges only the ALJ's physical findings as they relate to her diabetes, the Court further limits its discussion of the evidence accordingly.

findings on examination throughout 2022.[2] (*Id.* at 432-33, 441-42.)

On May 4, 2023, Winans saw Megan Kathryn Conniff, PA-C, for follow up after Winans' hospitalization for diabetic ketoacidosis. (*Id.* at 686.) Hospital treatment providers diagnosed Winans with diabetic ketoacidosis secondary to a medication, Farxiga. (*Id.*) Hospital treatment providers switched her medication to higher dose Metformin and Amaryl. (*Id.*) Winans reported doing well on the new medication, although her blood sugar levels continued to be "quite variable," which frustrated her. (*Id.*) Winans also told Conniff her stress levels had been higher because of her hospitalization, going to school, quitting her job to focus on schoolwork, and dealing with the financial impact of not working. (*Id.*) Conniff continued Metformin and Amaryl and started insulin lispro. (*Id.* at 688.)

Blood work taken that day revealed an elevated A1c level of 9.3 (normal being 4-5.6%) and an elevated estimated average glucose level of 220 mg/dL (normal being 68-114 mg/dL). (*Id.* at 659.)

On May 18, 2023, Winans saw Dr. Katabay for medication management and endorsed pain in her neck, left shoulder, and bilateral knees and feet that she rated as a 2/10. (*Id.* at 561.) Winans reported associated neuropathy in her feet that was worse when her glucose levels were elevated. (*Id.* at 565.) Dr. Katabay continued Naprosyn, Zanaflex, Gabapentin, Topamax, Percocet, and Xtampza. (*Id.* at 567.)

On June 7, 2023, Winans saw Christian Louis Bonasso, M.D., for complaints of "significant tailbone pain." (*Id.* at 392.) On examination, Dr. Bonasso found full strength of the bilateral lower extremities and a normal neurological exam. (*Id.* at 393.)

On July 10, 2023, Winans saw PA-C Conniff via video for follow up after a recent emergency room visit for abdominal pain. (*Id.* at 700.) Winans reported an abdominal workup did not reveal anything and she was wondering if it could be related to her pancreas. (*Id.* at 700-01.) Winans endorsed constant nausea

[2] The treatment records for 2023 note virtual examinations based on Winans' subjective reports. (Tr. 486-87, 504-05, 522-23, 546-47.)

and occasional vomiting, as well as frequent hypoglycemic episodes where her blood sugars drop into the 50s and 60s. (*Id.* at 701.) Winans denied vision changes and headaches. (*Id.*) Conniff noted concern that Winans was developing gastroparesis and ordered a gastric emptying test. (*Id.*) Conniff thought the hypoglycemia stemmed from glimepiride and instructed Winans to cut the pills in half and see if her symptoms improved; if not, Conniff would discontinue the medication. (*Id.*) Conniff continued insulin lispro on a sliding scale if necessary. (*Id.* at 701-02.)

On July 10, 2023, Winans saw PA-C Conniff via video for complaints of blood sugar instability. (*Id.* at 706-07.) Winans reported that one moment her blood sugar would be in the high 200s or 300s and then she would take a little insulin, sometimes as small as 5 units, and her blood sugar would drop into the 60s. (*Id.* at 707.) Winans denied vision changes and headaches. (*Id.*) Conniff adjusted Winans' medication and ordered a continuous glucose monitor with alarms to help with Winans' hypoglycemic episodes. (*Id.* at 707-08.)

On February 5, 2024, Winans saw PA-C Conniff via video for complaints of hand swelling. (*Id.* at 756.) Winans wondered if the swelling was related to her neuropathy. (*Id.*) Her hands swelled enough that she struggled to grasp things on occasion. (*Id.*) Winans told Conniff it was difficult to tell if the numbness or the swelling was causing her grip problems. (*Id.*) Winans endorsed continued variable blood sugar levels that were high one moment and then too low the next. (*Id.*) She reported she sometimes failed to hear the hypoglycemia alarm at night, and her significant other had to wake her up and force her to eat. (*Id.*) Conniff ordered lab work. (*Id.* at 757.) Conniff noted Winans was no longer taking Gabapentin. (*Id.*) Conniff thought the swelling could be caused by Winans' neuropathy but wanted to check Winans' kidney function first. (*Id.*)

On March 6, 2024, Winans went to the emergency room for complaints of flank pain and abdominal pain for the past two days. (*Id.* at 822, 824.) Winans reported "out of control" blood sugar levels that ran

from high to low. (*Id.* at 824-25.) On examination, treatment providers found generalized abdominal tenderness, intact sensation, and intact motor function. (*Id.* at 830.)

On March 7, 2024, Winans saw Noman Khan, M.D., for evaluation of leukocytosis. (*Id.* at 834.) On examination, Dr. Khan found intact sensation, 5/5 strength in all extremities, no obvious joint inflammation, and intact range of motion. (*Id.* at 840.) Dr. Khan thought the leukocytosis was caused by stress and smoking, and recommended smoking cessation. (*Id.* at 845-46.)

The record contains a 90-day readout of data from Winans' continuous glucose monitor, covering mid-September 2024 through mid-December 2024. (*Id.* at 857-916.) During those 90 days, Winans' glucose levels were "very high" 2% of the time, "high" 16" of the time, "in range" 82% of the time, "low" 0% of the time, and "very low" <1% of the time. (*Id.* at 857.)

On December 23, 2024, Winans saw PA-C Conniff for follow up and reported abdominal pain for the past several months along with significant weight loss. (*Id.* at 917.) Winans endorsed continued blood sugar swings consisting of hyperglycemia for two hours post insulin injection followed by a "rapid decrease in blood sugar levels." (*Id.*) On examination, Conniff found mild abdominal tenderness in the epigastric area. (*Id.* at 918.) Conniff diagnosed Winans with chronic pancreatitis and started Winans on medication. (*Id.* at 919.) Conniff noted Winans' A1c level was 7, which was within the target range, although Winans continued to struggle to control her blood sugar levels. (*Id.*) Conniff continued Winans' diabetes medication for the time being, although Conniff noted adjustments may be made in the future if the instability continued. (*Id.* at 919-20.)

**C. State Agency Reports**

On December 9, 2023, Stephen Koch, M.D., reviewed the file and opined that Winans could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. (*Id.* at 80-81, 90-91.) She could stand and/or walk for about six hours in an eight-hour workday and sit for about six hours in an

eight-hour workday. (*Id.* at 80, 90.) She could frequently climb ramps and stairs but never climb ladders, ropes, or scaffolds. (*Id.*) She could frequently stoop, kneel, crouch, and crawl. (*Id.*) Her ability to balance was unlimited. (*Id.*) She must avoid all exposure to hazards. (*Id.* at 81, 91.)

On April 26, 2024, Steve McKee, M.D., affirmed Dr. Koch's findings. (*Id.* at 103-04, 113-14.)

**D. Hearing Testimony**

During the December 2, 2024 hearing, Winans testified to the following:

- She lives in a house with her boyfriend. (*Id.* at 41-42.) The laundry is in the basement, and she cannot do stairs very well. (*Id.* at 41.) She can only make one or two trips up and down the stairs before she gets pain in her hips, knees, and feet. (*Id.* at 42.) The pain is "excruciating," even with her pain medication. (*Id.*)

- She holds a valid driver's license. (*Id.*) She chooses when she drives. (*Id.*) Her night vision has worsened, so she has trouble driving at night. (*Id.*) She gets blurry vision when her blood sugar is high, so she must be very cautious about driving. (*Id.*)

- She works part-time as a grocery delivery driver for Walmart. (*Id.* at 42-43.) She started in mid-October. (*Id.* at 43.) She works for an hour or two when she is feeling okay and makes a "pretty decent amount of money" without having to work 40 hours a week. (*Id.*) She works five hours a week on average. (*Id.* at 44.) She did not work at all last week because her blood sugar levels were "all over the place." (*Id.*) There have been times where she logged in and was assigned a few orders where she felt like she would be out of the house for a long time and not make much money, so she decided not to work and logged out. (*Id.*) The most that she must lift at one time is a case of water or soda. (*Id.*) She will make a few trips in one delivery if that is what she needs to do. (*Id.*) She uses curbside service to pick up her delivery orders. (*Id.* at 52.)

- She has a Labradoodle who keeps her company and keeps her busy. (*Id.* at 50.) She used to enjoy cooking and baking, but she cannot do that anymore because of her hands. (*Id.*) She does housework when she can. (*Id.*) She has not mopped the floor in two weeks, which is unusual for her. (*Id.* at 51.) She can vacuum because they only have one room with carpet. (*Id.*) She had not dusted in a very long time because some days she cannot grip or pick things up without dropping them. (*Id.*) She has broken some of her favorite things by dropping them. (*Id.*) She cannot hold a full cup of coffee anymore. (*Id.*)

- Her sugar levels become elevated when she showers no matter what the water temperature is, which causes her to become lightheaded. (*Id.* at 52.) She loses her balance when that happens, so her boyfriend installed a grab bar in the shower. (*Id.*) She only washes her hair once a week because her hands go numb when they are above her head for long periods of time. (*Id.*)

- She does not go to restaurants. (*Id.*) She uses curbside service for her groceries. (*Id.*)

- She tracks her blood sugar levels with a continuous glucose monitor. (*Id.* at 54.) The results go to her phone. (*Id.*) Her boyfriend has the app on his phone as well, because sometimes she sleeps for 18 hours and he must make sure her blood sugar levels do not crash and cause her to go into a coma. (*Id.*) Her blood sugar levels average out because she has such highs and lows. (*Id.* at 55.) Her pancreas does not work. (*Id.*) Even if she eats something that is low in sugar, but it does not have enough protein or has too many carbohydrates, her blood sugar spikes. (*Id.*) She will then administer a short-acting insulin shot, which sometimes takes two to four hours to work, and then her blood sugar drops down low. (*Id.*) It is very unpredictable. (*Id.*) In a perfect world, her doctor would place her on an insulin pump, but none of her doctors seem to want to do that. (*Id.* at 56.) She cannot calculate anything in advance; she must wait and see how her body reacts to the carbohydrates before she administers insulin. (*Id.*) Her blood sugar tends to be lower when she sleeps for long periods of time. (*Id.* at 61.) She can tell when her blood sugar spikes most of the time, as she gets sweaty and hot and her skin feels prickly. (*Id.* at 62.) It is harder for her to tell when her blood sugar is low. (*Id.*) She has woken up to her low blood sugar alarm in the middle of the night, and while she feels tired, it is not any more than normal. (*Id.*) Her doctor wants her to undergo some tests for her diabetes, but she has not been able to do it because she is waiting to hear that they are covered by Medicaid. (*Id.* at 65.)

- She wakes up in the morning with her hands stiff, swollen, and numb. (*Id.* at 57.) She struggles to straighten them out. (*Id.*) When she can straighten them, she gets burning, tingling, and numbness. (*Id.*) She cannot grab things. (*Id.*) She struggles to pick up coins sometimes. (*Id.*) She also struggles with zippers and buttons. (*Id.*) She wears clothes that are easy to get on and off. (*Id.*) She can text on her phone, but she prefers to talk instead. (*Id.* at 59.) She has pain in her knees, ankles, feet, and hips, especially her right hip. (*Id.*) She gets swelling in her right hip as well. (*Id.*) She also gets pain in her right shoulder. (*Id.* at 60.) She has had arthritis since she was 25, and she is prone to bone spurs. (*Id.*) She still gets pain in her tailbone, even though it was removed. (*Id.*) She must take Gabapentin 24/7 or else her feet "absolutely kill [her]." (*Id.*) Her feet sting and burn when her blood sugar is high. (*Id.*) She gets pain in every joint. (*Id.*) The pain comes and goes, and the location of it changes. (*Id.*)

The VE testified that Winans had past work as a quality control clerk, mixer operator, and delivery driver. (*Id.* at 69.) The ALJ then posed the following hypothetical question:

> [C]an you please assume a hypothetical individual of the same age, education, and work experience as a [sic] claimant, that can perform light exertional work with the following additional limitations. This individual can occasionally climb ramps and stairs, occasionally stoop, kneel, crouch, crawl, but can never climb ladders, ropes, and scaffolds. They can frequently handle, finger, and feel with the bilateral upper extremities. Frequently reach in all directions with the bilateral upper extremities. They can have no exposure to unprotected heights or moving mechanical parts, can perform no commercial driving. They

> can carry out simple tasks, but can perform no work that requires satisfaction of production quotas or that involves assembly line pace. They can have occasional interaction with coworkers, supervisors, and the general public, and they can deal with occasional changes in a routine work setting. Could such a hypothetical individual perform any of the claimant's past work?

(*Id.* at 70.)

The VE testified that the hypothetical individual would not be able to perform Winans' past work as a quality control clerk, mixer operator, and delivery driver. (*Id.*) The VE further testified that the hypothetical individual would be able to perform other representative jobs in the economy, such as routing clerk, marker, and mail clerk. (*Id.* at 71.) The ALJ asked the ALJ what the impact would be on the identified jobs if the ALJ added an additional limitation to occasionally handle, finger, and feel with the bilateral upper extremities. (*Id.* at 72.) The VE testified that such a limitation would be work preclusive. (*Id.*)

In response to further questioning from the ALJ, the VE testified that an individual could miss no more than one day a month on average over a year and could be off task no more than up to 10% of the workday. (*Id.*)

## III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Winans was insured on the alleged disability onset date, April 1, 2023, and remains insured through June 30, 2028, the date last insured ("DLI"). (Tr. 14-15.) Therefore, in order to be entitled to POD and DIB, Winans must establish a continuous twelve-month period of disability commencing between these

dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2028.

2. The claimant has not engaged in substantial gainful activity (SGA) since April 1, 2023, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: Diabetes Mellitus with Neuropathy; a history of Coccydynia, status/post - surgical intervention; Anemia; Leukocytosis; Major Depression; Anxiety; and Post-traumatic Stress Disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she could occasionally climb ramps and stairs; she could occasionally stoop, kneel, crouch, and crawl; she should avoid climbing ladders, ropes, and scaffolds; she could frequently handle, finger, and feel with the bilateral upper extremities; she could frequently reach in all directions with the bilateral upper extremities; she should avoid exposure to unprotected heights and moving mechanical parts; she should avoid commercial driving; she could carry out simple tasks; she should avoid performing work that requires the satisfaction of production quotas or work that involves an assembly line pace; she could tolerate occasional interactions with coworkers, supervisors, and the general public; and she could tolerate occasional changes in a routine work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on January **, 1980, and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the

claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2023, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-28.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence

could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

Winans challenges the ALJ's RFC findings as it relates to her diabetes. (Doc. No. 8 at 8.) Winans argues that the ALJ committed harmful error by finding that Winans' claims regarding her neuropathy were unsupported by the record, when the medical evidence "regularly documents complaints of neuropathy in

her hands and feet." (*Id.*) Winans maintains that the record evidence "supports greater manipulative limitations" because she reported problems gripping objects. (*Id.* at 11.) In addition, Winans asserts that the ALJ committed harmful error "by relying on a single A1c reading, when the record contains reliable evidence of unstable blood glucose levels and resulting symptoms" during the relevant period. (*Id.* at 9.) Winans claims that the instability of her blood sugar levels would cause her to be "excessively absent or off task." (*Id.* at 11.)

The Commissioner responds that substantial evidence supports the ALJ's RFC findings, including the ALJ's analysis of Winans' diabetes and neuropathy. (Doc. No. 9 at 7.) The Commissioner argues that the ALJ considered Winans' subjective symptoms, the objective medical evidence, Winans' treatment history, Winans' daily activities, and the prior administrative medical findings before determining that Winans could perform a reduced range of light work. (*Id.* at 8-10.) The Commissioner asserts that the ALJ "explicitly discussed" the rationale for the limitations the ALJ incorporated into the RFC regarding Winans' diabetes. (*Id.* at 9.) The Commissioner maintains that the ALJ imposed greater limitations than the state agency reviewing physicians to account for Winans' complaints of neuropathy and pain in her upper extremities. (*Id.* at 12.) According to the Commissioner, by citing evidence that Winans argues supports her allegations and shows she is more limited than the ALJ found, Winans is asking the Court to reweigh the evidence in her favor. (*Id.*)

In her reply, Winans argues that she is not asking the Court to reweigh the evidence. (Doc. No. 10 at 1.) Rather, she asks the Court to review the ALJ's rationale for the RFC findings, which Winans asserts lacks the support of substantial evidence "because it omits or mischaracterizes evidence that is material to the ALJ's RFC finding." (*Id.*)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 404.1545(a)(1).[3] A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 404.1527(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in

[3] The regulations governing disability insurance benefits and social security income are the same. *See* 20 C.F.R. § 404.1501 *et seq.*; 20 C.F.R. § 416.901 *et seq.*; *see generally Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). For convenience, the Court cites these regulations interchangeably.

the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

In the RFC analysis, the ALJ acknowledged that Winans suffered from diabetes with neuropathy and her testimony that "she experiences diabetic symptoms, numbness and swelling her hands, which limit her ability to hold onto things and engage in fine manipulation. . . ." (Tr. 21.) The ALJ analyzed Winans' neuropathy and diabetes as follows:

> Next, the undersigned notes that the record documents the claimant has diagnosed with Diabetes Mellitus with neuropathy. However, despite her reports of experiencing severe neuropathy resulting in trouble with using her hands, a review of the evidence fails to regularly document reports of these issues throughout the record or consistent findings during the physical examinations of record, which noted normal neurological findings with 5/5 strength being noted (See e.g. 3F/3). Alternatively, the undersigned notes that in February 2024, the claimant complained of hand swelling and inquired

> whether it was neuropathy-related; however, the record notes that she had stopped taking Gabapentin as directed (See 7F). Further, despite her allegations, during physical examinations performed in 2024, she was noted to have a stable gait, and did not need assistance to rise from chair (See e.g. 11F/5). Additionally, during a physical examination performed while seeking emergency care on March 6, 2024, she was noted to have intact sensation/motor function (See 12F/9).
>
> Thereafter, during an associated physical examination performed on March 7, 2024, the claimant was noted to present with 5/5 strength in all extremities, intact sensation, no obvious joint inflammation, and intact range of motion (See 13F/7). Moreover, in contrast to her allegations of experiencing disabling symptoms associated with her impairments, during audiovisual consultation performed on September 12, 2024, the record documents she denied experiencing changes to her vision, hearing, or having a headache (See, e.g. 14F/1). Further, despite her complaints of uncontrolled blood glucose levels, the undersigned notes that her Hemoglobin A1c level was assessed as being 7% 1 [sic] December 23, 2024, which was noted to be within target range (16F/3).

(*Id.* at 22-23.)

In weighing and analyzing the opinions of the state agency reviewing physicians, the ALJ further found as follows:

> Next, the undersigned considered the opinions of the State Agency medical consultant at the Initial and Reconsideration levels (1A, 3A, 7A, & 8A), who opined the claimant retains the ability to perform work at the light level of exertion, with exertional, postural, and environmental limitations. The undersigned finds the medical consultants' opinions to be generally persuasive. First, the consultants support their conclusions with citation and discussion of specific evidence of record. Further, those conclusions, specifically that the claimant retains the ability to perform light exertional work, are generally consistent with the overall record. For example, they are consistent with her examination findings generally, including 2024 exams noting stable gait, no assistive device needed to rise from chair (11/5); intact sensation/motor (12F/9); 5/5 strength, intact sensation, no obvious joint inflammation, and intact range of motion (13F/7). However, the undersigned notes that the updated record received at the hearing level also supports the manipulative limitations found within the above-stated RFC, due to limiting effects of the claimant's complaints of neuropathy and pain affecting the bilateral upper extremities.

(*Id.* at 24.)

Regarding Winans' subjective complaints, the ALJ found as follows:

> Overall, in addition to of [sic] the analysis of the opinion evidence and administrative findings analyzed below, the undersigned finds that the totality of the record supports limiting the claimant to performing work at the light level of exertion, consistent with the limitations found within the above-stated RFC. This finding is supported by the claimant's reports to her treating sources noted throughout the record, the clinical and objective findings of record, and evidence of the claimant's performance of significant functional activities that are noted throughout the record, including continuing to work, which involves driving, a task that entails concentration, and interacting with others, while picking up/delivering items (See Hearing Testimony), attending school online during the relevant period to pursue degree in psychology (See 5F/66 & 6F/4). Additionally, supporting the above-noted finding, the undersigned notes that the claimant reported that she stopped working around the time of the alleged onset date to focus on school, as opposed to limitations caused by her medical impairments (See 5F/66).

(*Id.* at 23.)

Substantial evidence supports the RFC findings. It is true that, contrary to the ALJ's assertion, the record contains regular complaints of neuropathy. (*See, e.g.*, *id.* at 423, 429, 433, 439, 442, 483, 487, 501, 505, 519, 523, 543, 547, 756.) However, the ALJ accurately stated that the record lacked "consistent findings during the physical examinations of record" regarding Winans' neuropathy. (*Id.* at 22.) In addition, the ALJ accurately stated Winans' A1c level from December 23, 2024, at which time Winans' treatment provider continued Winans' diabetes medication. (*Id.* at 919-20.) Furthermore, the readout from Winans' continuous glucose monitor from mid-September 2024 through mid-December 2024 showed that Winans' glucose levels were "in range" 82% of the time. (*Id.* at 857.) The ALJ considered Winans' testimony concerning her physical impairments, as well as medical records, activities of daily living, including working part-time, and the state agency physicians' opinions. (*Id.* at 21-25.) In doing so, the ALJ properly considered several findings that undercut Winans' claims of disability. *Miller v. Comm'r of Soc. Sec.*, 524 F. App'x 191, 194 (6th Cir. 2013) (citing 20 C.F.R. §§ 404.1529(c)(3), 404.1571, 416.929(c)(3), 416.971)). The Court notes that Winans fails to challenge the ALJ's subjective symptom determination or the weight assigned to the state agency reviewing physicians' opinions on judicial review.

While Winans interprets the records differently, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton*, 246 F.3d at 772-73 (6th Cir. 2001). In the Sixth Circuit, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Again, it is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here. While Winans would weigh the evidence differently, it is not for the Court to do so on appeal.

There is no error.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: November 12, 2026

*s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**